# Supreme Court of Texas

No. 22-0482

In the Interest of A.P., a Child

On Petition for Review from the
Court of Appeals for the Tenth District of Texas

JUSTICE YOUNG, joined by Justice Lehrmann, Justice Blacklock, and Justice Busby, concurring in the denial of the petition for review.

This petition raises the important and delicate question of what role a parent's status as a victim of domestic violence should play when the government seeks to terminate a parent–child relationship. In this case, the court of appeals affirmed the termination of the parental rights of petitioner A.R., whom I will call "Mother." In explaining why this termination was in the best interest of A.P., whom I will call "Daughter," the court's chief explanation was as follows:

> Most telling, and most troubling in our best interest review, however, is the emotional trauma that was inflicted on [Daughter] which was expressed at a visit with [Mother] in the middle of the proceedings. [Mother] came to a visit with [Daughter] with visible blood, bruises, cuts, and scratches from some type of altercation. [Daughter] was extremely upset when she saw her mother. . . . [Mother] did not want to miss the visit, so she came in a battered condition without consideration for how it might affect [Daughter] to see her that way.

No. 10-22-00008-CV, 2022 WL 1417356, at *3 (Tex. App.—Waco 2022).

Although I concur in the denial of the petition for review, I do so despite rather than because of that assertion. I certainly do not doubt that emotional trauma can properly inform the best-interest analysis. Nor do I suggest that the parental rights of a victim of domestic violence cannot be terminated if, for example, that parent cannot protect her child. Rather, precisely because termination is so serious, courts must ensure that the analysis does not reduce to inevitably terminating the rights of such a parent *because of* her status as a domestic-violence victim.

My concerns touch on both the record (which reflects a far less gruesome image than the quoted depiction) and the law (which requires heightened rigor and care before destroying the fundamental constitutional rights of parents to a relationship with their children and vice versa). Sadly, it is a recurring circumstance for parents—most typically mothers—to simultaneously be victims of abuse and be subject to the loss of their parental rights. I therefore write separately to address the judicial treatment of that recurring pattern.

\* \* \*

First, some legal and factual background. Daughter was removed by the State following concerns about drug use and neglect. To have even a shot at reunification with her child, Mother learned, she must comply with a "service plan." A service plan is a document prepared by the government and then made an order of the court. It consists of a lengthy and detailed series of requirements designed to show that retaining the parent–child relationship remains in the child's best interest, including by demonstrating that the problems leading to the removal of the child

2

have been remedied.

"These [service] plans can be difficult—perhaps impossible—to comply with fully." *In re A.A.*, ___ S.W.3d ___, 2023 WL 3910142, at *9 (Tex. June 9, 2023). Yet noncompliance with a service plan is a serious predicate ground for terminating parental rights. *See* Tex. Fam. Code § 161.001(b)(1)(O). Very serious indeed: *many* terminations in this State are predicated solely on the failure to complete a service plan under paragraph O, as reflected in this Court's cases and those in the courts of appeals. Both the government and the courts have often been extremely unforgiving of even minor deviations.

The requirements of a service plan vary, but typically among them, as here, is compliance with a schedule of supervised visits with the child. The plans likewise generally include (also as in this case) the admonition that failing to make a visit would constitute grounds for the courts to permanently terminate parental rights.

Translated into more ordinary language, failure to make the visits (or to do anything else the service plan requires) could lead the court to end Mother's very status as Daughter's mother. In the eyes of the law, they would become strangers. As a legal matter, that family would cease to exist. Justice Lehrmann's bleak but accurate statement says it best: "Termination of parental rights, the total and irrevocable dissolution of the parent–child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). The Court has repeatedly agreed with Justice Lehrmann's description. *See, e.g.*, *In re J.W.*, 645 S.W.3d 726, 751 (Tex. 2022); *In re D.T.*, 625 S.W.3d 62, 69 (Tex. 2021).

3

This Court, therefore, has long expressed "the view that termination is such a drastic and grave measure that involuntary termination statutes are strictly construed in favor of the parent," *Holick v. Smith*, 685 S.W.2d 18, 21 (Tex. 1985), reserving termination for only the gravest of cases. But at least as a general matter, it is not unreasonable to condition successful completion of a service plan (and thus to avoid the dire outcome of parental termination) on maintaining a schedule of visits with the child. After all, what fit parent whose child has been removed by the State would regard such visits as a burden rather than a gift? What parent would not desire as many visits with her child as possible, whether a service plan requires them or not?

The record in this case reflects that Mother desperately wanted to see her child and vice versa. As the court of appeals observed, Daughter "appeared to be bonded to her mother." Daughter's counselor confirmed at trial that "[Daughter] absolutely missed her mom. She did voice that quite a bit." The foster mother made the same point on the stand. When Daughter was upset, she said, "we soothed her and calmed her down, and she said that she missed her mom."

Mother, however, had few resources and was in an abusive relationship. A scheduled visit was approaching, but she had recently been beaten and appeared battered in a way that might distress Daughter. What should she do? Give up the chance to see Daughter and risk termination? Or go, but risk seriously disturbing Daughter by appearing in her current condition?

Mother seemed to face defeat no matter what she did. Under paragraph O, adhering to the service plan was essential to avoid

4

termination of her parental rights. But if attending the visit meant inflicting emotional harm on Daughter—who was just five years old at the time—that would then supply *another* predicate ground for termination under paragraph E. *See* Tex. Fam. Code § 161.001(b)(1)(E).

Facing this Hobson's choice, Mother chose to make the visit—and this is what led to the court of appeals' lead conclusion about best interest. As I noted, that court emphasized Mother's "visible blood, bruises, cuts, and scratches" as its primary basis for affirming that the termination was in Daughter's best interest. The description in the court of appeals' opinion is so jarring because it suggests that Mother, openly bleeding, had done nothing to conceal such fresh and untreated injuries. One might well wonder, given this frightening depiction, whether Mother could not have shielded Daughter from seeing at least *some* of it. Could she not have obscured the worst wounds, put on a long-sleeved shirt, washed off the blood, or taken similar steps?

In fact, the record does not bear out the overstated portrayal of how Mother appeared to Daughter—certainly not enough to be the most significant and weighty part of a best-interest analysis that culminates in termination. The language adopted by the court of appeals does appear in the record—they were the words *of counsel for the State* to which a witness who was not at the scene said "Yes" (during direct examination, no less). I quote the relevant testimony in the margin below.[1] But

---

[1] The witness was the licensed professional counselor assigned to Daughter. After counsel established that the witness found Daughter to be truthful, this line of questioning developed:

Q. Okay. And, now, there was sometime, I believe, in

5

another witness *was* on the scene—the foster father, who personally took Daughter to the visit in question and observed Mother. His direct examination came after the testimony of the counselor that the court of appeals summarized. In his own words—not merely saying "yes" to counsel—he described Mother's appearance this way: "She had, as I recall, a black eye, scuff marks along her arm and on her leg." He added that he "would have put the injuries at about five days. The scuff marks were scabbed over." He agreed with counsel for the State that "the

---

August where she had a meeting with her mother, correct?
    A. Yes.
    Q. And this particular visit traumatized [Daughter], would you say?
    A. This event was emotionally triggering for her.
    Q. And let me -- let me be clear for the Court. The mother showed up to a visit where she was bloody and bruised, correct?
    A. Yes.
    Q. And that had been reported to you by [Daughter]?
    A. It had been reported to me by several parties, [Daughter] including one of them.

The Court briefly interrupted the testimony to address an administrative matter. The examination continued, when counsel notably omitted the key word "bloody":

    Q. Okay, Ms. Pryor. I believe I was asking you about the incident where the mother showed up to her visit with [Daughter] looking bruised, correct?
    A. Yes.

Notably, several minutes later in her testimony, that witness read from her notes, quoting what Daughter had told her, reflecting injuries but not gore:

    "I saw Mom all beat up. She had cuts all over her. She had a black eye. [Boyfriend] did this to her. I don't know why she is with him. He did this before." [Daughter] was able to point and describe to me where the lacerations and cuts were on her -- on the mom's body. So she remembered very specific details of that event.

6

injuries *did not appear to be new*." (Emphasis added.)[2]  His wife, when describing the visit at trial, recounted it this way, also omitting any depictions of blood and gore: "My husband picked [Daughter] up late in the afternoon . . . to take her to Cameron Park to have a visit with her mom. . . . When she came home, she related a story of seeing her mom in an injured way."

In short, the record confirms that Mother was noticeably injured—but nothing like the evocative description provided by counsel for the State and relied upon by the court of appeals.  This discrepancy is no minor detail.  It matters because the court of appeals found the "emotional trauma that was inflicted on [Daughter]" by seeing her battered mother at the ill-starred visit was not just a detail in the story but its chief

[2] In other words, even counsel backed away from the blood-dripping image that the single, brief question she asked to the licensed professional counselor might have suggested.  Again for completeness, the relevant testimony of the foster father proceeded as follows:

> Q. So, Mr. Wilson, were you present at that visit?
> A. At the beginning of the visit.
> Q. Were you able to see the mother?
> A. Yes.
> Q. Okay.  Can you describe what the mother looked like?
> A. She had, as I recall, a black eye, scuff marks along her arm and on her leg.
> Q. Okay.  So it appeared that she had been recently injured?
> A. I would have put the injuries at about five days.  The scuff marks were scabbed over.
>   . . .
> Q. . . . So, Mr. Wilson, the injuries did not appear to be new, correct?
> A. No.
> Q. And, so, can you describe what you saw and [Daughter]'s reaction to seeing her mother that way?
> A. She was scared and concerned.

7

episode.  It was the "[*m*]*ost* telling, and *most* troubling [consideration] in our best interest review," according to the court.

Because of the grave consequences of a termination, it is incumbent that we get it right when we tell parents why they no longer may be parents.  The event remains relevant, of course.  Even if Mother's appearance was not nearly as shocking as described, it is at least clear that she could not fully conceal her victimization at the visit—certainly not from her perceptive child.  The court of appeals accurately described that some witnesses thought Daughter's general anxiety increased after—and because of—the visit in question.  *Id.*[3]  At trial, counsel for the State cross-examined Mother about this fateful visit, asking, "You didn't think that there was a problem showing up to your visit with [Daughter] having bruises and cuts all over you?"  Mother responded with candor and humility: "I knew that it wasn't probably the best idea.  But I didn't want to miss the chance of not seeing my daughter."[4]

Without question, the visit was challenging—which speaks well of Daughter's emotional maturity despite her short yet heartbreaking childhood.  It would probably be more concerning if such a small child who cared about her mother had no reaction upon perceiving her parent's suffering.  The emotional distress to Daughter was real, in other words, but when placed in its proper context, it seems less abnormal.  Daughter's

---

[3] Daughter surmised that the abuse came from Mother's partner (who had a record of domestic abuse).  Mother, by contrast, "contended that she had been in an unprovoked altercation with [a family member] right before the visit."

[4] The court of appeals' contention that Mother "came in a battered condition *without consideration* for how it might affect [Daughter]" (emphasis added) seems to be supported by no evidence, but it would be reasonable to draw the no-consideration conclusion *if* the depiction of the visit had been accurate.

evident love for Mother makes it easier to understand the little girl's pain.

*   *   *

I pause to emphasize that I have no intent to romanticize the story or suggest that Mother was a model parent. To the contrary, Daughter's early life did not satisfy the basic standards that any child in Texas should enjoy. Our laws properly protect children when their parents' shortcomings fall below a certain level. Following a trial, the district court terminated Mother's rights to Daughter, and a panoply of reasons—not just the distressing visit when Mother had been battered—explain this decision. The court of appeals had no real choice but to affirm. Indeed, as the court of appeals noted, Mother did not challenge every ground for termination on appeal, making it impossible to reverse the termination on the ground that no predicate act could be established. Nor, given this record, is there a legal basis to disturb the district court's best-interest conclusion—that basis just cannot be the one that the court of appeals deemed *most* telling and significant.

This brings me to my final point: the law that applies in these circumstances. Getting the law right is just as important as ensuring that we accurately recount the record in this and every termination case.

To conduct the best-interest analysis in a termination proceeding, Texas courts have traditionally considered several enumerated "*Holley*" factors.[5] The list in the footnote is not exhaustive, but, in my judgment,

---

[5] They include: "(A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these

9

the court of appeals erred in extending it to include (and to elevate to top importance) Mother's battered appearance and condition at a mandatory, scheduled visitation.

I address this point because, as I said earlier, the stakes are so high: "A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude." *J.W.*, 645 S.W.3d at 740. And it goes the other way, too: no child should be deprived of her biological parent unless the law requires it. While that high bar is met here,[6] the one event that mattered *most* to the court of appeals is not among the plausible grounds to uphold the trial court's judgment.

And this concern is why I write separately. While this case can only come out one way, placing such emphasis on this mistaken factor could lead to improper judgments in future cases. I fear that this approach is just shy of deeming a mother's *status as a victim* to be in and of itself sufficient to warrant termination.

Showing up and putting forth effort to maintain a relationship with a child is usually seen as a *positive* step. Of course, it is the best interest *of the child* that we are focused on, and I do not discount the fear, sadness, or anger that a child may feel when seeing a battered or

---

individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent." *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (footnotes omitted).

[6] Both Mother and the men with whom she resided abused drugs and were unable to give Daughter the supervision and support she needed. These men had a history of domestic violence. One of them stabbed himself, allegedly in Daughter's presence.

abused parent. But even as our focus remains on the child, we should be especially wary of standards, or the application of standards, that disproportionately affect victims of domestic violence and such victims' children.

This is not to say that the victimization of a parent could not lead to circumstances that are linked to relevant and probative bases for a best-interest analysis. The problem is in cutting corners and inadvertently converting a parent's *status* as an abuse victim into a de facto basis for termination. For example, Daughter's own safety might be in question if Mother's safety was in jeopardy—something that might be true *regardless* of how well Mother could disguise her injuries. Likewise, knowingly or repeatedly placing Daughter in a position where she would likely observe serious violence against *anyone* (the parent or someone else) would clearly warrant the State's protection and likely termination of parental rights.

*Those* factors may properly be weighed in a best-interest analysis. But pointing to evidence of a direct link to such considerations is crucial, particularly when addressing an isolated incident like the visit here. Otherwise, the fact that a woman was assaulted—something that is never the victim's fault—practically becomes the chief tool to destroy that woman's status as a mother simply for showing up to see her child after enduring an unquestionably tragic and violent event. Our courts must remain highly attuned to the risk of conflating victimization with unfitness without taking that additional step.

\* \* \*

I finally add that my comments come with deep respect for the

11

court of appeals in this case and all the other courts that must confront sad cases like this one. This Court sees case after case involving the termination of parental rights; our colleagues on the trial courts and the courts of appeals see far more of this depressing corner of the docket.

I wish that the People of Texas better understood the faithful, daily service to our State that these judges of our trial and intermediate appellate courts perform by addressing this grim aspect of their caseload day after day. It is grinding work to pass judgment on whether one of our fellow citizens has fallen so far beneath basic standards that his or her right to remain a parent must be withdrawn. But the work must be done.

My respectful disagreement with the analysis of the court of appeals is accompanied by my recognition of that court's determination to protect the rights of *both* an innocent daughter—a precious child who deserves a flourishing future—*and* her mother, a citizen who deserves every lawful consideration before losing her parental rights. Parental-termination cases are never easy or taken lightly by any court, as I well know. Surely that is especially true in cases like this one, where it is clear that the problem was *not* a lack of love, but the inability—due to drugs or other malign influences—to rise to the high calling of a parent. Yet judges must follow the law. I conclude that the law required the court of appeals to uphold the district court's termination order, and I concur in the denial of the petition for review of the court of appeals' judgment.

Evan A. Young
Justice

**OPINION FILED:** June 30, 2023

12